Filed 1/12/23  Anguiano v. City of Manteca CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| DELIA ANGUIANO, | C091966 |
| Plaintiff and Appellant, | (Super. Ct. No. STK-CV-UPI-2017-0002927) |
| v. | |
| CITY OF MANTECA, | |
| Defendant and Respondent. | |

SUMMARY OF THE APPEAL

Plaintiff Delia Anguiano brought a personal injury action against defendant City of Manteca (City) after she tripped and fell on a rise in a sidewalk.  The City brought a motion for summary judgment, which the trial court granted on the bases that (1) the defect in the sidewalk on which Anguiano tripped was trivial as a matter of law and Anguiano lacked evidence to show it was obviously dangerous; and (2) there was no evidence that the City had actual or constructive notice of the alleged dangerousness of

1

the sidewalk, which the City would need to have in order for liability to attach to the City.

On appeal, Anguiano takes issue with the trial court's conclusion that the defect at issue was trivial. Anguiano weaves into her analysis arguments regarding whether the condition was obvious, which are more aptly relevant to the issue of whether the City had constructive notice of the allegedly dangerous nature of the sidewalk's condition. (See Gov. Code, § 835.2 [constructive notice requires the condition to be "of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character"]; *Martinez v. City of Beverly Hills* (2021) 71 Cal.App.5th 508, 520 ["A defect is not obvious just because it is nontrivial"].)

In its responding brief, the City argues the defect was trivial as a matter of law; Anguiano failed to properly address the trial court's finding that the City lacked notice of the allegedly dangerous condition and this court should not now review the issue; and the City had neither actual nor constructive notice of the existence of a dangerous defect. The City also argues we should not be able to consider this appeal because it was untimely, and it asks us to reconsider an evidentiary ruling made by the trial court if we are inclined to reverse the judgment.

Because we will affirm the judgment on the basis that the defect at issue was trivial as a matter of law, we need not consider the question of whether the City had notice of the allegedly dangerous condition or the City's request to reconsider evidentiary rulings. We will, however, briefly consider the City's argument that the appeal was untimely.

FACTS AND HISTORY OF THE PROCEEDINGS

Pleadings

Anguiano filed the First Amended Complaint (complaint) which is the operative complaint in this action, on May 8, 2017. The complaint alleged a single personal injury

2

cause of action against the City for premises liability. Plaintiff alleged she was injured because of a dangerous condition of public property and the City had actual or constructive knowledge of the dangerous condition with sufficient time prior to the injury to have corrected the condition. Specifically, Anguiano alleged that on June 7, 2016, she was seriously injured when she tripped on a raised sidewalk crack in the 1300 block of West Yosemite Avenue in Manteca then fell to the ground. Anguiano sought compensatory damages for lost wages, medical expenses, general damages, and loss of earnings. The City answered the complaint on June 7, 2017.

Motion for Summary Judgment

In January 2019, the City filed a motion for summary judgment arguing it was entitled to summary judgment for two reasons. First, the City argued that the undisputed material facts established that the sidewalk condition upon which Anguiano tripped and fell was not dangerous as a matter of law. Second, the City argued that Anguiano could not establish that the City had sufficient advanced actual or constructive knowledge of the allegedly dangerous property condition to have been able to take steps to remedy the condition prior to Anguiano's fall. The hearing on the motion was continued twice to allow the parties to engage in further discovery.

City's Evidence Submitted with the Moving Papers

The City included portions of Anguiano's deposition testimony with its moving papers. In her deposition, Anguiano described the weather on the day of the incident as "clear" and "nice." She testified that she did not see an uplifted section of sidewalk prior to her fall. She described the fall by saying, "when I walked out of the check cashing place, I just walked off to the sidewalk and [the] next thing I know I was on the ground." She fell forward, and when she looked back to where she had tripped, she saw the raised edge of the sidewalk. During her deposition, she stated she never measured the height of the edge where she tripped and admitted she did not know how high it was.

3

In the responses to special interrogatories submitted with the moving papers, Anguiano contended the sidewalk was in a dangerous condition "based upon the height differential in the sidewalk panels at the property where she was injured, and the substantial damage[s] and cracks to the sidewalk at the property where she was injured."

The City submitted the declaration of its finance director, Jeri Tejeda, in support of the motion. He declared that the City's risk management department maintains an electronic access log that documents every citizen complaint and claim made with the City dating back to 2004. He said he personally reviewed the log and, other than Anguiano's claim, located no other claims or complaints regarding the sidewalk condition on the 1300 block of West Yosemite Avenue. He also stated, "I am unaware of any complaints, claims or injuries involving any sidewalk condition on the 1300 block of West Yosemite Avenue from the City's annual inspections prior to Delia Anguiano's fall."

Plaintiff's Opposition Evidence

In her initial response to the motion, Anguiano did not dispute that the day of her accident was a clear and nice day.

Anguiano submitted portions of her deposition testimony with her opposition papers. She testified about a copy of a photograph she submitted with her claim to the City. She could not approximate when she took the photo. On the photo, she marked approximately 15 feet from the door of the check-cashing store and four feet from the curb, which is where she estimated she fell. The photograph is not a close-up, and does not provide a good visual of the condition of the sidewalk in the approximate area where Anguiano alleges she fell, but based on what can be seen, it looks like she has estimated that she tripped and fell on the transition between two panels on the left half of the sidewalk, with the check-cashing store to her left and the curb and a tree to her right. Her car was parked further along the sidewalk, some distance beyond the tree.

4

Anguiano submitted portions of the deposition of Lucky Shaw, who appears to be a City employee. He stated he and one of his crew members went out to inspect the area the day they received notice of Anguiano's fall, and the next day he sent a crew out to ramp and grind the area.

During his deposition, Shaw reviewed a series of six photographs. One photograph, taken on September 27, 2016, shows a photo of the sidewalk and check cashing store located at 1330 West Yosemite. He describes the sidewalk as "broken and raised" and agrees that it is "broken in several locations." He described a photograph including a level and tape measure as showing the transition of the raised sidewalk. He took the measurements. He estimates the height differential shown in one photograph is one and 3/4 inches (1 3/4"). He estimates other measurements reflected in the series of photos were one inch (1"), and between 1 inch (1") and one and 1/4 inches (1 1/4").

Looking at the series of photographs used during Shaw's deposition—and comparing it to Anguiano's marked photograph and deposition testimony regarding where she fell—it appears that the general area around where Anguiano fell was two sidewalk panels wide. Treating the side of the sidewalk where the check cashing business was located as the left side, the curb as the right side, and the area a panel would cover as a section, the two lower sections and upper-left section were concrete slabs, and the upper-right section was a dirt well where a tree grew. The upper-left panel and the lower-right panel have both been pushed up so they are raised above the lower-left panel. The height difference between the two left panels, where Anguiano's marked photograph suggests she fell is at an incline, with the difference being approximately one inch (1") at the left edge and approximately one and three-quarter inches at the right edge (1 3/4"). There was a crack in the lower-right panel, running from approximately the middle of the top edge to the panel's bottom left-hand corner. Viewed in conjunction with the photograph Anguiano submitted with her claim, these photographs show that to the extent there are broken and raised panels along the block, they are panels immediately

5

abutting the tree. The path of the panels on the left side appears to be fairly smooth, with only the rise between the two panels where Anguiano appears to have tripped—i.e., there are no cracks with jagged edges or broken panels in the footpath from the front of the check cashing store to the panels where Anguiano represented she fell.

Shaw also testified a bit about Government Outreach, a computer-based application the City uses to file complaints and concerns. It is a website that citizens can access to file complaints; so if a citizen has a complaint regarding sidewalks, they can go to the website and file a complaint and the complaint will be forwarded to him.

Anguiano also submitted portions of the deposition of Tejeda. He testified about the City's log that tracked claims filed against the City. He testified the log would only keep track of formal claims against the City. Direct citizen complaints would not be reflected in the log. He testified the City also has a trip and fall log where it keeps citizen complaints. It is an excel file that dates back to 2017, which means any of the claims reflected in the log would have been received after Anguiano allegedly tripped on the City's sidewalk.

<u>Plaintiff's Supplemental Opposition Evidence Submitted After First Continuance</u>

Following the court's first continuance of the hearing on the motion, Anguiano submitted a declaration of Maria Elena Fabila. According the declaration, Fabila was working at a business located on the south side of the 1300 block of West Yosemite Avenue on the day of the accident, where she had been employed for several years before June 2016. She stated that prior to the date Anguiano was injured, she "observed the sidewalk in various states of disrepair, including, but not limited to, substantial cracking and raised sidewalk panels adjacent to trees." She stated that pictures attached to her declaration—which appear to be black and white copies of four out of the six photographs used in the Shaw deposition—accurately depicted the condition of the sidewalk as it had existed from at least the beginning of 2016.

6

Anguiano also submitted a declaration of Brian Carroll following the trial court's first continuance.  According to the declaration, Carroll began working at a business on the south side of the 1400 block of West Yosemite Avenue on September 14, 2015, which would be approximately 10 months before Anguiano's fall.  The business was across the street from the portion of the 1300 block of West Yosemite Avenue at issue. Carroll said that since he began working at his job, he has seen cracks and raised sidewalk panels adjacent to trees on the south side of the 1300 block.  He could see the conditions in the 1300 block just by looking or walking on the south side of the street. He said from September 2015 forward, he saw the conditions of the 1300 and 1400 blocks progressively worsen.

Carroll verified that a photograph attached to his declaration accurately depicted the condition of the sidewalk for several months prior to the summer of 2016.  The photograph's quality is not good, and it appears to capture the defect at issue from a distance—roughly three fairly long sidewalk panels away.  However, you can surmise from the photograph that there is a rise of some degree between the two panels.  Carroll also declared a batch of photos date stamped September 27, 2016— which appear to be black and white copies of four out of the six photographs used in the Shaw deposition— accurately depict the condition of the 1300 block for several months prior to the summer of 2016.

City's Supplemental Evidence Submitted After Second Continuance

The City included portions of the deposition of Maria Fabila with supplemental evidence it submitted after the trial court's second continuance of the hearing on the motion for summary judgment.

The following exchange occurred during the deposition:

"Q.  Okay.  The second sentence of paragraph four is, 'I observed the sidewalk in various states of disrepair, including but not limited to

7

substantial cracking and raised sidewalk panels adjacent to trees.' Is that true?

"A. Just the one in front of my store, the tree in front of my store, the panels or panel in front of my store.

"Q. Okay. So the paragraph says, 'I observed the sidewalk in various states of disrepair.' Do you agree with that?

"A. I mean, I actually didn't see it raising, if that's what that means.

"Q. Okay. Would you describe the sidewalk as in various states of disrepair? [¶] . . .

"A. . . . I mean it was raised.

"Q. Okay. So then the next part says, 'Including but not limited to substantial cracking.'

"A. I don't remember -- well, I mean, if it raised it was -- the roots caused it to crack, that's how it was able to raise.

"Q. Okay. So do you -- would you say that in the area there is substantial cracking?

"A. Not to my recollection. . . . [¶] All I remember is that particular panel next to the tree in front of my store.

"Q. Okay. And so the next part is, 'Raised sidewalk panels adjacent to trees.'

"A. Panel one.

"Q. So there is one panel that was raised?

"A. Well, I think it was two where it cracked in half or the two panels and the cracked and that's how they were raised.

"Q. Okay. So as I am understanding it there would be two pieces?

"A. Yes.

"Q. Okay. So there is one raised?

"A. Uh-huh, yes.

"Q. Okay. And that's what you had observed?

"A. Yes.

"Q. Okay. But you had not observed other states of disrepair like substantial cracking?

"A. Not that I made a mental note of, I mean."

When pressed further about her statement in her declaration that the sidewalk condition was obvious, Fabila admitted she could not say if it was obvious to anyone else. She testified, "I would park in front of it so as not to encounter it. Because I know myself and I probably would have been the first victim, but --so I parked up front past the front door so I wouldn't have to." She stated she wouldn't walk across the portion of sidewalk at issue.

The City also included portions of the deposition of Brian Carroll with its supplemental filings. During his deposition, Carroll said he is familiar with the street on which Anguiano fell because he has walked in the area a few times to go to a nearby liquor store. He said as far as he can remember, "that whole area of [the] sidewalk was not level when I was hired." But he also said he has never walked on the sidewalk in front of the check cashing store. "I never stood in that exact spot, but that whole stretch of sidewalk was uplifted from the trees."

He admitted he could not say the first time he noticed this specific raise in the sidewalk. When asked if he ever noticed the specific raise, he answered, "[t]hat specific raise followed the rest of that sidewalk. I mean, I can't tell you that that specific raise was any better or any worse than the sidewalk—you know, going west of the sidewalk, going east. I couldn't tell you that." He knew the sidewalk generally had raises going back to 2014, and with respect to that spot, "it was the same as the rest of the sidewalk. It was just the trees were all planted at the same time. There would be no reason for it to be any different. . . . [¶] . . . I remember driving by and seeing it raised, but that's all I

9

remember." When asked if he could recall driving by and seeing that specific raise he said, "[s]ure." He said, "[t]he day I got hired that whole area was like that." "But that specific spot, I couldn't tell you exactly how bad. Whenever this person tripped and fell, I couldn't tell you exactly how bad it was. But that sidewalk was never level until, you know, they repaired it." The following exchange occurred:

> "Q. What I understood you to say is that you don't remember this specific raise, but you do know that the entire sidewalk had raised problems?
>
> "A. Correct.
>
> "Q. Okay.
>
> "A. Yes. [¶] . . . [¶]
>
> "Q. Okay. So you don't know when this specific raise would have arisen, you just know the entire sidewalk has problems since September 2014?
>
> "A. Correct."

Anguiano's Supplemental Opposition Evidence Submitted After Second Continuance

Anguiano submitted portions of Carroll's deposition testimony as part of her supplemental evidence submitted after the second continuance. When counsel asked him about the "specific area" he said, "[a]ctually, yes, I remember it being lifted. Sure. I never walked that area. I drove by it every day, not hard to miss when you're driving down the street and you see it. Obviously it was there." When pressed further he said, "[i]t was no different than the rest of the sidewalk, the parts I remember. Okay. Whether it was before the rest of the area that were lifted or it came after I couldn't tell you. But I remember that part of the sidewalk being lifted, yes. . . . [¶] . . . Just by driving by it every day."

<u>The</u> <u>Trial</u> <u>Court's</u> <u>Ruling</u>

After initially issuing a tentative ruling denying City's motion, on October 24 2019, the trial court granted City's motion for summary judgment.

DISCUSSION

I

*Timeliness of the Appeal*

Before we address the central issues in this appeal, we dispense with the City's argument that Anguiano did not file a timely notice of appeal. In light of emergency orders issued in early 2020, the notice was timely.

The trial court entered its judgment on January 29, 2020. The City had notice of entry of the judgment personally served on Anguiano on January 31, 2020. On April 1, 2020, Anguiano served a notice of appeal on defendant by mail and email. However, the notice was not filed until May 19, 2020.

The City argues that Anguiano's deadline to file a notice of appeal under California Rules of Court, rule 8.104(a) (Rule 8.104) was April 1, 2020, and, because the notice of appeal was filed 48 days later, we must dismiss the appeal as untimely. Anguiano argues that COVID-19 emergency orders issued by the trial court tolled the period of time to file a notice of appeal between March 17, 2020, and May 27, 2020, and, therefore, the notice of appeal was timely.

Rule 8.104(a) requires a party to file a notice of appeal, "on or before the earliest of: [¶] (A) 60 days after the superior court clerk serves on the party filing the notice of appeal a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, showing the date either was served; [¶] (B) 60 days after the party filing the notice of appeal serves or is served by a party with a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, accompanied by proof of service; or [¶] (C) 180 days after entry of judgment."

Sixty days from January 31, 2020, was March 31, 2020, Cesar Chavez Day, a California State Holiday, which would have meant that, absent an exception, the notice of appeal had to be filed by April 1, 2020. (Code Civ. Proc., §§ 12a, subd. (a), 135; Gov. Code, §§ 6700, subd. (a)(6), 6717; Cal. Rules of Court, rule 1.10(a).) However, Rule 8.104 contains an exception that applies here.

Rule 8.104(b) allows a court to extend the date to file a notice of appeal under Rule 8.66. (Rule 8.104(b) ["Except as provided in rule 8.66, no court may extend the time to file a notice of appeal"].) Under California Rules of Court, rule 8.66(a) (Rule 8.66), "[i]f made necessary by the occurrence or danger of [a] . . . public health crisis, or other public emergency, . . . the Chair of the Judicial Council, notwithstanding any other rule in this title, may: [¶] (1) Toll for up to 30 days or extend by no more than 30 days any time periods specified by these rules; or [¶] (2) Authorize specified courts to toll for up to 30 days or extend by no more than 30 days any time periods specified by these rules." Additionally, under Rule 8.66(c), "[i]f made necessary by the nature or extent of the public emergency, with or without a request, the Chair of the Judicial Council may renew an order issued under this rule prior to its expiration. An order may be renewed for additional periods not to exceed 30 days per renewal."

On March 17, 2020, the trial court issued an order under authority granted to it by Chief Justice Tani G. Cantil-Sakauye that deemed March 17, 2020, to March 30, 2020, holidays as contemplated by Code of Civil Procedure, section 12a, subdivision (a) (Section 12a), which provides, "[i]f the last day for the performance of any act provided or required by law to be performed within a specified period of time is a holiday, then that period is hereby extended to and including the next day that is not a holiday." On April 3, 2020, the trial court issued a similar order, also under Chief Justice Cantil-Sakauye's authority, deeming April 1, 2020, through May 1, 2020, holidays as contemplated by Section 12a. Again, on April 28, 2020, and also under Chief Justice Cantil-Sakauye's authority, the trial court issued a third order deeming May 1, 2020,

12

through May 27, 2020, holidays as contemplated by Section 12a.  We have taken judicial notice of these orders.

Under these orders, the "next day that [was] not a holiday" after Cesar Chavez Day, March 31, 2020, for purposes of filing a timely notice of appeal in the trial court was May 28, 2020.  (See Section 12a.)  Thus, under these orders, which provided permissible extensions to file the notice under Rules 8.66 and 8.104(b), the notice of appeal was timely filed on May 19, 2020.

## II

### *The Defect Was Trivial as a Matter of Law*

A.    The Standard of Review

A court must grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c).)  "In determining if the papers show that there is no triable issue as to any material fact, the court shall consider all of the evidence set forth in the papers, except the evidence to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence, except summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence if contradicted by other inferences or evidence that raise a triable issue as to any material fact."  (*Ibid.*)

" 'A defendant moving for summary judgment bears an initial burden of showing that the plaintiff's causes of action have no merit, and the defendant meets this burden by making a prima facie evidentiary showing that one or more elements of each cause of action cannot be established, or there is a complete defense to each cause of action.' (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849–851 [] (*Aguilar*); Code Civ. Proc., § 437c, subd. (p)(2).)  If the defendant meets its initial burden, the burden shifts to the plaintiff to produce evidence of a triable issue of material fact concerning the

13

challenged element or defense. (*Aguilar*, *supra*, at pp. 849–851; Code Civ. Proc., § 437c, subd. (p)(2).) 'There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' (*Aguilar*, *supra*, at p. 850.) Throughout the motion, however, the moving party bears an overall burden of persuasion that there is no triable issue of material fact and that the moving party is entitled to judgment as a matter of law. (*Id.* at p. 850 & fn. 11.)" (*Huckey v. City of Temecula* (2019) 37 Cal.App.5th 1092, 1103 (*Huckey*).)

We review orders granting motions for summary judgment de novo. (*Huckey*, *supra*, 37 Cal.App.5th at p. 1103.) In so doing, we consider "all of the evidence adduced on the motion (except evidence the trial court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Mayes v. La Sierra University* (2022) 73 Cal.App.5th 686, 697; see also *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) "The appellate court must liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. (*Zubillaga v. Allstate Indemnity Co.* (2017) 12 Cal.App.5th 1017, 1021 [].) The trial court's reasons for granting the motion are not binding on appeal, because the appellate court reviews the trial court's ruling, not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [].)" (*Huckey*, *supra*, 37 Cal.App.5th at p. 1103.)

### B.     Liability Under the Government Claims Act

The Government Claims Act (Act) (Gov. Code, § 810, et seq.) governs the City's liability.

Under the Act, "[e]xcept as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a

14

reasonably foreseeable risk of the kind of injury which was incurred, and [¶] . . . [¶] [t]he public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (Gov. Code, § 835, subd. (b).) Thus, if the property was not in a dangerous condition at the time of the injury, the government has no liability.

"An initial and essential element of recovery for premises liability under the governing statutes is proof a dangerous condition existed." (*Stathoulis v. City of Montebello* (2008) 164 Cal.App.4th 559, 566 (*Stathoulis*).)

A "dangerous condition" is statutorily defined to mean "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (Gov. Code, § 830, subd. (a).)

The Act also specifies when a court may find a condition is *not dangerous* as a matter of law: "[a] condition is not a dangerous condition within the meaning of this chapter if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used." (Gov. Code, § 830.2.)

A trivial danger does not require the danger to be non-existent. (*Huckey*, *supra*, 37 Cal.App.5th at p. 1109 [a height differential was not a dangerous condition as defined by the Act, even though "[t]o be sure, the height differential posed some risk of injury"].) "It is a matter of common knowledge that it is impossible to maintain a sidewalk in a perfect condition. Minor defects are bound to exist. A municipality cannot be expected to maintain the surface of its sidewalks free from all inequalities and from every possible obstruction to travel. Minor defects due to continued use, or action of the elements, or

15

other cause, will not necessarily make the city liable for injuries caused thereby. What constitutes a minor defect is not always a mere question of fact. If the rule were otherwise the city could be held liable upon a showing of a trivial defect." (*Whiting v. National City* (1937) 9 Cal.2d 163, 165.)

"The trivial defect doctrine is not an affirmative defense. It is an aspect of duty that a plaintiff must plead and prove. (*Cadam v. Somerset Gardens Townhouse HOA* (2011) 200 Cal.App.4th 383, 388 [].)" (*Huckey*, *supra*, 37 Cal.App.5th at p. 1104.) The trivial defect standard represents a recognition "of the difficulty of maintaining heavily traveled surfaces in perfect condition [and] is the practical recognition that minor defects inevitably occur, both in construction and maintenance, and that their continued existence is not unreasonable. In such case, irrespective of the question of notice of the condition, no liability may result." (*Fielder v. City of Glendale* (1977) 71 Cal.App.3d 719, 724 (*Fielder*).)

"In appropriate cases, the trial court may determine, and the appellate court may determine de novo, whether a given walkway defect was trivial as a matter of law. (§ 830.2; *Stathoulis*, *supra*, 164 Cal.App.4th at p. 569.) 'Where reasonable minds can reach only one conclusion—that there was no substantial risk of injury—the issue is a question of law, properly resolved by way of summary judgment.' (*Caloroso v. Hathaway*[ (2004)] 122 Cal.App.4th [922,] 929 (*Caloroso*).) If, however, the court determines that sufficient evidence has been presented so that reasonable minds may differ as to whether the defect presents a substantial risk of injury, the court may not conclude that the defect is trivial as a matter of law. (*Kasparian v. AvalonBay Communities, Inc.*[ (2007)] 156 Cal.App.4th [11,] 28.)" (*Huckey*, *supra*, 37 Cal.App.5th at pp. 1104-1105, fn. omitted.)

"As to what constitutes a dangerous or defective condition no hard-and-fast rule can be laid down, but each case must depend upon its own facts." (*Fackrell v. San Diego*

16

(1945) 26 Cal.2d 196, 206.) "In determining whether a given walkway defect is trivial as a matter of law, the court should not rely solely upon the size of the defect . . . although the defect's size 'may be one of the most relevant factors' to the court's decision. (*Fielder*[, *supra*,] 71 Cal.App.3d [at p. ]734 [].) The court should consider other circumstances which might have rendered the defect a dangerous condition at the time of the accident. (*Ibid.*) [¶] These other circumstances or factors include whether there were any broken pieces or jagged edges in the area of the defect, whether any dirt, debris or other material obscured a pedestrian's view of the defect, the plaintiff's knowledge of the area, whether the accident occurred at night or in an unlighted area, the weather at the time of the accident, and whether the defect has caused any other accidents. (*Fielder*[], *supra*, 71 Cal.App.3d at p. 734; *Stathoulis*, *supra*, 164 Cal.App.4th at p. 567.) In sum, '[a] court should decide whether a defect may be dangerous only after considering all of the circumstances surrounding the accident that might make the defect more dangerous than its size alone would suggest.' (*Caloroso*, *supra*, 122 Cal.App.4th at p. 927.)" (*Huckey*, *supra*, 37 Cal.App.5th at p. 1105.)

"The court's analysis of whether a walkway defect is trivial involves as a matter of law two essential steps. 'First, the court reviews evidence regarding type and size of the defect. If that preliminary analysis reveals a trivial defect, the court considers evidence of any additional factors [bearing on whether the defect presented a substantial risk of injury]. If these additional factors do not indicate the defect was sufficiently dangerous to a reasonably careful person, the court should deem the defect trivial as a matter of law . . . .' (*Stathoulis*, *supra*, 164 Cal.App.4th at pp. 567–568.)" (*Huckey*, *supra*, 37 Cal.App.5th at p. 1105; see also *Nunez v. City of Redondo Beach* (2022) 81 Cal.App.5th 749, 757.)

"Sidewalk elevations ranging from three-quarters of an inch to one and one-half inches have generally been held trivial as a matter of law. (*Caloroso*, *supra*, 122 Cal.App.4th at p. 927, citing *Barrett v. City of Claremont* (1953) 41 Cal.2d 70, 74 []

17

[and cases cited therein] and *Fielder*[], *supra*, 71 Cal.App.3d at p. 724, fn. 4 [same].)" (*Huckey*, *supra*, 37 Cal.App.5th at p. 1107.)  And a height differential on a sidewalk of up to one and 7/8 inches (1 7/8") has been found, when considered along with other factors, to be trivial.  (See *Beck v. Palo Alto* (1957) 150 Cal.App.2d 39, 41-42.)

Factors considered in the second half of the analysis include the presence—or lack of presence—of "broken concrete pieces or jagged concrete edges in the height differential or seam between the two concrete panels at the time plaintiff fell," and whether it is known that another person has tripped and fallen on the same defect, and that, as far as the City knew, no other persons other than plaintiff had tripped or fallen on the height differential.  (*Huckey*, *supra*, 37 Cal.App.5th at p. 1108; see also *Fielder*, *supra*, 71 Cal.App.3d at p. 734.)  "The court should also look at other factors such as whether the accident occurred at night in an unlighted area."  (*Fielder*, at p. 734.)

C.  *Application*

Applying step one of the trivial-defect analysis, we note that the undisputed fact that the rise between the two slabs of the sidewalk where Anguiano fell was one and 3/4 inches (1 3/4"), at its highest along its slant.  Thus, the size of the rise is within a range that courts have found trivial when taking into account surrounding circumstances.  (See *Beck v. Palo Alto*, *supra*, 150 Cal.App.2d at pp. 41-42.)

Next, we consider other factors.  The City checked its logs dating back to 2004, and found no record of claims or complaints of others being injured on the 1300 block of West Yosemite, and Anguiano produced no evidence that others had fallen at the same spot.  When Anguiano fell, it was a bright and nice day.  While other panels of the sidewalk along the right side of it also show some cracking and rising, "there were no broken concrete pieces or jagged concrete edges in the height differential or seam between the two concrete panels" where Anguiano marked on a photograph as where she

18

fell, and the rise was not so close to other defects in the larger sidewalk to render the rise more perilous to navigate. (See *Huckey*, *supra*, 37 Cal.App.5th at p. 1108.)

It is true that Carroll, Shaw, and Fabila all offered some testimony about broken and raised panels in the general area where Anguiano fell. However, when pressed during her deposition, Fabila said all she could really recall that was of note was some cracking and raising of one panel adjacent to a tree in front of her store.

Similarly, when asked about his recollections during his deposition, Carroll talked about panels along the stretch of sidewalk being "uplifted from the trees," and admitted he "never stood in that exact spot" and that that he could not say whether the "specific raise" at issue was better or worse than the rest of the sidewalk. Viewed in tandem with the photographs Anguiano produced, all this establishes is that panels closest to trees in the 1300 block of West Yosemite Avenue sometimes broke and had cracks, but the path Anguiano claimed she was walking on when she fell had only the one height differential. Viewing the evidence most favorably to the plaintiff we find no reasonable person would conclude that the sidewalk's condition where Anguiano fell created a substantial risk of injury when used with due care in a manner in which it was reasonably foreseeable that it would be used. The defect was trivial as a matter of law and, therefore, not dangerous within the meaning of the Government Code. (See Gov. Code, § 830.2.)

Anguiano argues the fact that Fabila said she was afraid to walk on the sidewalk near where Anguiano fell and the court's reversal of its tentative decision both show that reasonable minds could differ on the dangerousness of the sidewalk. As to Fabila's statement about being hesitant to walk on that area of the sidewalk, here there is no evidence that any of the sidewalk damage—that is, no damage even arguably relevant to proving the defect that caused plaintiff's fall—was more than trivial as the law allows it to be defined. There is no evidence Fabila's hesitation to walk on any area of the sidewalk signals otherwise; her subjective fear to walk on a portion of the sidewalk, even

19

if it were the same portion where the accident took place, is not dispositive or even relevant to our determination that the defect in the sidewalk was trivial.

As to Anguiano's argument about the tentative ruling, it is unpersuasive. The trial court's decision to change its tentative decision merely means that, after further consideration and based on the law and the facts, the trial court was not persuaded that the defect in the sidewalk was more than trivial. The trial court's further consideration of the matter does not require a conclusion that, here, reasonable minds can differ on the trivial nature of the sidewalk defect. Carried to its logical conclusion, if a trial court decided a particular defect in a slip and fall case was *not* trivial and a court of appeal was prepared to decide that it was, the court of appeal would be precluded from reversing the trial court simply because the two courts' views on the law and the facts differed.

Anguiano also argues that the City produced no substantial evidence that would obviate a conclusion that the defect here was trivial, focusing on the fact that the City has not produced expert testimony regarding how Anguiano's fall likely occurred, unlike in *Huckey*, where the expert's opinion became central to the parties' arguments and the trial court's decision.

In *Huckey*, experts were used by the parties primarily to measure the height differential between two panels where the plaintiff fell, because by the time anyone got around to measuring the differential, the differential had been ground down. (*Id.*, *supra*, 37 Cal.App.5th at pp. 1096-1097, 1099.) To the extent they opined as to the possible footpath of the plaintiff, the opinion was offered in order to explain how the expert established the range for the height differential between the two panels where the plaintiff likely tripped and fell. (See *id.* at p. 1097.) In contrast, here, Anguiano marked on a photograph the approximate spot where she fell. In conjunction with her marked photograph, Shaw took measurements of the size of the rise between the two panels where Anguiano estimated she fell before the City ground and ramped the differential. The City did not need to submit an expert opinion to establish a range of the possible

20

height differential where Anguiano fell: at its highest, the rise was one and 3/4 inches (1 3/4"). Considered with the surrounding circumstances, even if Anguiano's foot hit the highest point of the rise, the defect was still trivial.

## DISPOSITION

We affirm the trial court's judgment. Pursuant to California Rules of Court, rule 8.278(a)(1), the City is awarded its costs on appeal.


                                           _____

                                           HULL, Acting P. J.


We concur:


_____

DUARTE, J.


_____

RENNER, J.